**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

STEVEN HARVEY; ARLEN
NORBY; DAVID GRIFFITH,

    Plaintiffs-Counter-Claim
Defendants-Appellants,

v.

MICHAEL BAKER,

    Defendant-Appellee,

CITY OF RIO RANCHO, a political
subdivision,

    Defendant-
Counterclaimant-
Appellee.

No. 06-2278
(D.C. No. CIV-04-401-WDS-RHS)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiffs Steven Harvey, Arlen Norby, and David Griffith appeal from the district court's grant of summary judgment in favor of defendants Michael Baker and the City of Rio Rancho ("City"). We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I.

Plaintiffs are police-officer employees of the City's Department of Public Safety ("DPS"), as well as members and former officers of the Department of Public Safety Association ("Union"). Defendant Baker was formerly the Director of DPS. Plaintiffs brought claims under 42 U.S.C. § 1983, alleging that defendants retaliated against them for exercising their First Amendment rights of free speech and association with the Union. After the close of discovery, defendants moved for summary judgment. The district court granted defendants' motions and denied plaintiffs' motion for reconsideration. On appeal, plaintiffs contend that the district court erred in concluding that they did not engage in any "speech," in ignoring their associational claims, and in resolving material disputed issues of fact.

We review de novo a district court's grant of summary judgment, using the same legal standard applied by the district court. *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007). Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We view all evidence and draw all reasonable inferences in favor of the nonmoving parties. *Deschenie*, 473 F.3d at 1276. "In cases involving the First Amendment, an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (quotation omitted).

This court applies a four-part test to determine whether a public employer retaliated against a public employee in violation of his First Amendment rights.

> First, this court must determine whether the employee's speech involves a matter of public concern. Second, if this threshold requirement is satisfied, this court then balances the employee's interest in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, if the employee's interest outweighs that of the government, the employee then must show that the speech was a substantial factor or a motivating factor in the detrimental employment decision. Fourth, if the employee shows the protected speech was a substantial factor, the burden shifts to the employer to show it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* (quotations and citations omitted). After the district court granted summary judgment in this case, this court clarified the application of this test when the plaintiff alleges retaliation by a public employer based on the employee's association with his union. *See Shrum v. City of Coweta*, 449 F.3d 1132, 1139 (10th Cir. 2006). We held that a court should not require a showing of "public

concern" or engage in judicial balancing of the employer's interest against the employee's interest when the employee alleges retaliation for participation in a union with which his employer has signed a collective bargaining agreement. *See id.*

**II.**

We will address each plaintiff's contentions in turn, as the facts pertaining to their individual claims of retaliation differ. But we first consider one common contention of all three plaintiffs: that they engaged in constitutionally-protected speech by "repeatedly [bringing] their concerns regarding anti-union retaliation to the attention of Rio Rancho City Councilman [Michael] Williams." Aplt. Br. at 2-3. All three plaintiffs rely *solely* on a brief excerpt from Mr. Williams' deposition testimony to support their allegations of having engaged in protected speech. He stated that during the two-year period of 2000 and 2001, Union board members including, but not limited to, Mr. Harvey, Mr. Norby, and Mr. Griffith, raised issues with him, which he described as follows: "Anti–basically, it was anti-union activity by the chief, transfers. I remember there was one issue about promotions." Aplt. App. at 161-62. Mr. Williams also indicated that by "the chief" he was referring to Chief Baker. *Id.* at 162. Plaintiffs acknowledge that Mr. Williams' testimony provides no details regarding what each Union board member actually reported. *See* Aplt. Br. at 7-8 ("no specific words are

-4-

identified"). But they assert that the evidence is "undisputed" on this issue. *See id.* at 11-12. Plaintiffs misconstrue their burden on summary judgment.

"Plaintiffs seeking to overcome a motion for summary judgment may not rest on mere allegations in their complaint but must set forth *specific* facts showing that there is a genuine issue for trial." *Trevizo v. Adams*, 455 F.3d 1155, 1159 (10th Cir. 2006) (quotations omitted). The question for this court on summary judgment is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (quotation omitted). Evidence relied upon in opposition to summary judgment "may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, conclusory, or self-serving." *Piercy v. Maketa*, 480 F.3d 1192, 1197-98 (10th Cir. 2007).

In *Trevizo*, we affirmed summary judgment against ten plaintiffs who failed to put forth deposition testimony or affidavits regarding the details of what had happened to them in support of their § 1983 claim for violation of their civil rights. 455 F.3d at 1160. We held that the evidence they did produce–which consisted of "vague, generalized statements from others"–was insufficient to carry their burden on summary judgment. *Id.* We noted that the record was particularly deficient in light of the time that they had to prepare their case and the granting of summary judgment on the eve of trial. *Id.* Similarly, in *Mitchell*

*v. City of Moore*, 218 F.3d 1190 (10th Cir. 2000), we affirmed summary judgment against the plaintiff on his § 1983 First Amendment retaliation claim where he "[failed] to specifically mention even one instance of speech [he engaged in]" and asserted only that "[p]laintiff engaged in union activity." *Id.* at 1199 (quotation omitted).

We reach the same conclusion in this case with respect to the plaintiffs' allegations of their reports of anti-union activity by Chief Baker, supported only by vague, non-specific testimony of Mr. Williams. That testimony is insufficient on its own to create a genuine issue of material fact with respect to any of the individual plaintiff's claims that *he* engaged in protected speech. Notably, although defendants' summary judgment motions were filed after the close of discovery and within months of the scheduled trial, there is no evidence in the record from any of the three plaintiffs themselves–either in the form of deposition testimony or by affidavit–as to what he reported to Mr. Williams and when he made such report.

Therefore, we hold that plaintiffs have failed to support this claim of protected speech with sufficient evidence to demonstrate a genuine issue of material fact. *See Trevizo*, 455 F.3d at 1160; *see also Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) (affirming summary judgment in Title VII case alleging hostile work environment where plaintiff's claim was "vague and conclusory,

without reference to specific dates or circumstances"); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) (same).

## III.

### *Mr. Norby*

Mr. Norby relies on an additional contention of protected speech and conduct in support of his claim of retaliation:  his participation in a Union-sponsored initiative petition drive.  During the period of March through May, 2001, the Union campaigned for a City charter amendment that would increase pay for police officers and set minimum staffing levels within DPS.  At that time, Mr. Norby was president of the Union.  He also presented evidence that he made public statements about the petition drive, which were quoted in the media.  *See* Aplt. App. at 41.  He testified in his deposition that City officials, including Chief Baker, opposed the Union's campaign.  *Id.* at 49.  He described the petition drive as a "negotiations ploy," indicating,

> We never intended it to go to a vote.  All we ever intended it for was to get the city to actually negotiate with us seriously about money.  It was a ploy from day one, and they were very resentful about the way we were handling it.

Aplee. Supp. App. at 79.  The Union's petition drive was ultimately unsuccessful.

Mr. Norby claims that he was denied a promotion in retaliation for his participation in the petition drive.  Three months after the drive ended, in August 2001, the City issued a job posting for the position of Lieutenant in DPS.  It is

undisputed that DPS had only five available Lieutenant positions during the time period relevant to Mr. Norby's claim. Mr. Norby and Mr. Griffith both tested for the position. In September, Chief Baker posted the eligibility list for promotions to Lieutenant. Mr. Griffith ranked fourth on the list and Mr. Norby ranked sixth. Neither Mr. Norby nor Mr. Griffith contends–nor did they present any evidence–that the testing/assessment process which determined the rankings for Lieutenant promotions was unfair or retaliatory, or constituted an adverse employment action with respect to them. The first four officers on the list were promoted to Lieutenant within the next few months–including Mr. Griffith, who was promoted in December 2001.

A Lieutenant position next became available in DPS in January 2002. At that time the fifth officer on the eligibility list was on active military duty, so the City held the position open for him until he returned to his employment with DPS. Mr. Norby contended that, in the other officer's absence, he should have been moved to the top of the eligibility list and promoted. Chief Baker testified that he believed the City was required by federal law to hold the position open for the officer on military duty.[1] When asked why he decided not to promote Mr. Norby at that time, he said, "It was based on [federal law] that I decided to promote [the fifth officer on the eligibility list], or I should say I knew I needed to have a

---

[1]    *See* the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4334.

vacancy or I needed to have a position for [him]. So it was based on that [federal law]." *Id.* at 71. Chief Baker informed Mr. Norby of the basis for his decision. Mr. Norby was ultimately the next officer promoted to Lieutenant when another opening for that position became available in April 2003.

Mr. Norby first argues that the district court erred in concluding that he failed to demonstrate protected speech on a matter of public concern in connection with his participation in the petition drive. He asserts that, because he alleged retaliation based on his protected right of association with the Union, under *Shrum* he did not need to show speech on a matter of public concern. *See* 449 F.3d at 1139. We need not reach this issue because Mr. Norby has presented insufficient evidence to raise a triable fact issue as to the third and fourth prongs of the four-part test for First Amendment retaliation.

The third prong requires a plaintiff to demonstrate an adverse employment action. *Maestas v. Segura*, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005).[2] Assuming for purposes of this appeal that defendants' failure to promote Mr. Norby in January 2002 was an adverse employment action, the third prong also required him to show that his protected speech or conduct "was a substantial motivating

---

[2]    The district court held that Mr. Norby failed to establish an adverse employment action because he did not show that he was legally entitled to the promotion. Even if that conclusion is wrong, we can affirm on any ground if the record is sufficient to permit conclusions of law, even grounds not relied upon by the district court. *Bell v. Bd. of County Comm'rs of Jefferson County*, 451 F.3d 1097, 1102 n.5 (10th Cir. 2006).

factor in the employer's decision to adversely alter [his] conditions of employment." *Id.* at 1188. He must present sufficient evidence linking the failure to promote to his prior protected speech and activity. *See id.*

There is no evidence establishing that causal link here–either directly or by reasonable inference. The evidence demonstrates that the failure to promote occurred at least seven months after Mr. Norby's participation in the Union's petition drive. Thus, there is no inference of causation based on a "*close temporal proximity between the speech and challenged action.*" *Id.* at 1189.

Moreover, although Mr. Norby presented evidence that defendants opposed the petition drive, *see id.*, he failed to demonstrate a *pattern* of retaliatory conduct beginning soon after his protected speech or conduct, from which a jury could infer that his participation in the drive was a motivating factor in the adverse employment action, *see Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). In fact, the evidence demonstrates that both Mr. Norby and Mr. Griffith were subsequently placed fairly on the eligibility list for promotion to Lieutenant, and that Mr. Griffith was quickly promoted to that position. Where Mr. Griffith was not denied a promotion, despite his participation in the same protected speech or conduct as Mr. Norby, the evidence fails to support an inference of causation. *See Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275, 1287 (10th Cir. 2003) (no inference of causation on claim of retaliation for protected speech where other employee also spoke out publicly

against department policies, but was not terminated); *Mitchell*, 218 F.3d at 1200 (no inference of causation on claim of retaliation for union activity where employees hired to replace plaintiff were past union presidents).

Most importantly, Mr. Norby does not question Chief Baker's explanation for failing to promote him as insincere or pretextual. *See Montgomery v. City of Ardmore*, 365 F.3d 926, 939 (10th Cir. 2004) (affirming summary judgment on First Amendment retaliation claim where plaintiff offered no evidence that reasons given for employment decision were pretextual); *Deschenie*, 473 F.3d at 1278 (same). Instead, he testified that he thought defendants' legal interpretation was wrong: "I believe the law says [the officer on military duty] is entitled to that promotion upon his return to the department. It says nothing about holding the position open while he's gone." Aplee. Supp. App. at 80-81. And he also admitted that the City could have promoted the other officer in absentia–which would have led to the same outcome as holding the position open. We are left, then, only with Mr. Norby's speculation that he was not promoted in January 2002 in retaliation for his participation in the petition drive the previous year. "Speculation or hunches admidst rumor and innuendo will not suffice." *Maestas*, 416 F.3d at 1189.

Nor has Mr. Norby presented any evidence to rebut the defendants' evidence that they would have made the same decision not to promote Mr. Norby in January 2002 in the absence of his protected speech and conduct. *See Orr v.*

-11-

*City of Albuquerque*, 417 F.3d 1144, 1154-55 (10th Cir. 2005) (affirming summary judgment on First Amendment retaliation claim where evidence was insufficient to demonstrate genuine issue of material fact on fourth prong). In the district court, in response to Chief Baker's explanation why he did not promote Mr. Norby, he asserted only that "Defendant Baker went so far as to violate the collective bargaining agreement ["CBA"] in order to keep from promoting Norby." Aplt. App. at 23. But he did not cite to any evidence to support this contention, even failing to submit the CBA itself. On appeal, Mr. Norby contends that "[d]efendants have never disputed that their failure to promote [him] violated the [CBA]." Aplt. Br. at 10. Once again, he misconstrues his burden in opposing summary judgment.

In short, Mr. Norby has failed to demonstrate any material fact in dispute regarding his claim of retaliation for exercising his First Amendment rights.

### *Mr. Griffith*

Mr. Griffith spearheaded the petition drive along with Mr. Norby, although unlike Mr. Norby, the record is devoid of evidence of any statements he made in connection with that activity. Once again, we will assume that Mr. Griffith sufficiently demonstrated protected activity based on his participation in the petition drive. He likewise claims that he was retaliated against because of that activity, contending that he was denied a promotion to Captain in April 2003. He does not claim that the selection process between himself and the other candidate

was tainted by retaliation. He asserts instead that Chief Baker eliminated the educational requirement for the Captain position, so that he would not be the sole candidate eligible to apply. Thus, Mr. Griffith claims that Chief Baker altered a long-standing requirement for promotion to Captain in order to deny him that promotion, in retaliation for his union activities.

The evidence indicates that, but for the elimination of the educational requirement, the other candidate promoted to Captain instead of Mr. Griffith would not have been eligible to apply for that position. Chief Baker testified that he changed that requirement for two reasons: (1) in order to carry through certain reduced qualifications, which had been negotiated with the Union, to the positions of Captain and Deputy Chief, consistent with the progression of qualifications for the lower level positions covered by the CBA; and (2) in order to address the situation of police officers dropping out of the competitive promotional process because of the backlog of officers who wanted to attend the police management schools, but had not yet been able to do so. Mr. Griffith did not present any evidence disputing Chief Baker's stated reasons for deleting the educational requirements. In fact, he testified that there were waiting lists for the limited classes. *See* Aplee. Supp. App. at 90.

In the district court Mr. Griffith contended that the Captain requirements were changed in 2003, between the time that the position became available and when it was formally posted–thus implying that Chief Baker made the changes

-13-

realizing that Mr. Griffith would otherwise be the only eligible candidate. But as the district court noted, the record does not support that contention because the undisputed evidence showed that the changes were made no later than November 6, 2001, per updated DPS Standards and Procedures issued on that date. *See id.* at 231.

Mr. Griffith argues on appeal that the evidence nonetheless supports an inference that Chief Baker's decision was retaliatory. He notes that "[s]ignificantly, Baker altered the requirements months *after* Griffith had participated in the petition drive." Aplt. Br. at 15-16. Although the evidence of the timing of Chief Baker's deletion of the education requirement for promotion to Captain does place that change closer to Mr. Griffith's alleged protected activity, there is still no close, temporal proximity to support an inference of causation. *See Maestas*, 416 F.3d at 1189. Moreover, Mr. Griffith was promoted to Lieutenant without incident within a month of the communication of the new Captain requirements, despite his participation in the petition drive, negating any inference of a pattern of retaliatory conduct.

In sum, we agree with the district court that "there is not a scintilla of evidence suggesting that the educational requirements were changed [in 2001] in anticipation of Griffith's testing for Captain in 2003." Aplt. App. at 177. There is simply no reasonable inference that could be made to support a jury finding that Mr. Griffith's union activity was a substantial motivating factor in that

decision. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1321 (10th Cir. 1999) ("Courts are not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones.") (quotation and alteration omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

### *Mr. Harvey*

The facts alleged by Mr. Harvey in support of his claim differ from the circumstances of the other two plaintiffs' claims because he did not participate in the petition drive in 2001.

Mr. Harvey had been president and vice president of the Union in the late 1990s. During that time period he also began working as the Coordinator for the New Mexico Gang Task Force ("Task Force"). The Task Force was funded by federal grant money and the City acted as the fiscal agent for the grant. For several years Mr. Harvey was assigned primarily to DPS functions, and in addition he worked part time as the Task Force Coordinator, for which he received a stipend. In 2001 he began working full time as the Task Force Coordinator. A year later, the City transferred fiscal agent responsibility to the New Mexico Department of Public Safety. The Task Force asked that Mr. Harvey continue as the Coordinator, indicating it would reimburse the City for his salary, stipend, and benefits.

The City then offered Mr. Harvey an agreement for conditions of continued employment as a term employee ("Agreement"). The Agreement provided that he would work under the supervision of the Task Force executive board, but would continue to comply with City work rules and operating procedures. It allowed him to be reinstated as a regular employee of the City under certain circumstances, including the availability of a vacant position in DPS. Chief Baker decided that the Agreement would not address the effect of Mr. Harvey's term employment on his seniority rights under the CBA. But the Agreement provided that he would not be a member of the Union bargaining unit and would not be eligible for any pay raises authorized by the city council.[3] He signed the Agreement in August 2002.

During the term of the Agreement, Mr. Harvey became Union president again in January 2003. Consequently, Chief Baker informed Mr. Harvey that he thought he was in breach of the provision precluding him from being a member of the Union bargaining unit. Chief Baker raised this issue with the city administrator, the city attorney and the city council, but no action was taken to terminate the Agreement. Chief Baker nonetheless testified that he did not intend

---

[3] While the Agreement was being drafted, Chief Baker indicated in an email that, as a contract employee, Mr. Harvey would not be a Union member and would therefore not be eligible for pay raises that Union members received. He also later testified that he did not know why the Agreement precluded Mr. Harvey from being in the Union bargaining unit, but that he believed the City's personnel policies stipulated that term employees could not be in the bargaining unit.

to renew the Agreement, which was scheduled to expire by its own terms on June 30, 2003, based in part on his belief that Mr. Harvey was in breach. But the record does not reflect when Chief Baker made this decision or when he communicated it to Mr. Harvey.

Mr. Harvey claims that he engaged in protected speech in February 2003, for which defendants retaliated against him. Sometime during the previous month he had received a copy of a letter accusing Chief Baker of wrongdoing. The letter was signed by Todd Sutterman and had been originally sent to the City's mayor almost a year earlier in March 2002 ("Sutterman Letter"). In his role as Union president, Mr. Harvey sent an email to the mayor asking if there had been an investigation into the allegations. When he did not receive a response, he forwarded the Sutterman Letter to the City Council members and local media in February 2003. Mr. Harvey asserts that it is undisputed that Chief Baker was angry with him over his distribution of the Sutterman Letter.

In April 2003, Mr. Harvey sent Chief Baker a memo, electing to be reinstated in his regular position as a detective in DPS. He testified that he made this decision because Chief Baker advised him that DPS would be at full staff within two weeks and the Agreement only provided for his reinstatement if there was a vacant position. Rather than requiring him to transition back to a detective position immediately, Chief Baker allowed him to continue in his role as Task Force Coordinator through June 30. In May, Mr. Harvey sought permission to

continue his Task Force coordinator role as secondary employment. Chief Baker approved that request, with the condition per department policy that he could not use DPS equipment. Mr. Harvey disagreed with that condition, but his request to arbitrate was denied by the City. He then filed an application for a preliminary injunction in state court challenging the condition, which that court ultimately dismissed.

For purposes of this appeal, we assume without deciding that Mr. Harvey engaged in protected speech by circulating the Sutterman Letter. On appeal, Mr. Harvey claims that he suffered two adverse employment actions:

> First, Baker forced Harvey into an employment contract (forgoing a city pay raise and seniority rights) in order to maintain his [Task Force] position. Then, a year later, Baker told Harvey that he would not renew the [Agreement] (because Harvey was the union president). Baker subsequently forced Harvey to choose between continuing as a DPS employee or an employee of the [Task Force]. These are adverse employment actions and should have precluded summary judgment.

Aplt. Br. at 14. The first alleged adverse employment action–"forcing" Mr. Harvey to enter into the Agreement in 2002–occurred seven months before he circulated the Sutterman Letter, and therefore could not have been in retaliation for his exercise of First Amendment rights.

Nor has he presented evidence to support his second allegation of an adverse employment action.[4] There is evidence that Mr. Baker questioned

---

[4] We note that Mr. Harvey did not make this second argument regarding an

(continued...)

-18-

whether the Agreement permitted Mr. Harvey to be Union president, but defendants did not terminate the Agreement and he served out his term as Union president. Although Chief Baker testified that he did not intend to renew the Agreement, the record does not reflect when he made that decision or when he communicated it to Mr. Harvey.

Mr. Harvey argues on appeal that "adverse employment action" is liberally construed in the context of a First Amendment retaliation claim. But there must be some action *by the employer* that is *adverse* to the employee. *See Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005) ("An employee alleging retaliation must show that his employer took some adverse employment action against him."). We agree with the district court that regardless of Chief Baker's intentions with respect to renewal of the Agreement, that issue became moot when Mr. Harvey elected to return to regular employment within DPS. Addressing his decision to transfer back to his detective position within DPS, he testified:

> I only did so after meeting with Mike Baker and being advised that there was no longer going to be any open staffing positions. I think when we met, he said actually that we would be full staff within two

---

[4](...continued)
adverse employment action in the district court. *See* Aplt. App. at 19 (arguing that his demotion from lieutenant to detective, inability to retest for lieutenant, and relinquishment of seniority rights and bargaining unit membership, were adverse employment actions). Ordinarily, we would conclude that he has waived his right to raise this issue on appeal. *See Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992) (declining to consider issue not raised in district court). But because the district court addressed the issue and he is responding to the district court's decision, we address the merits of the argument.

weeks, and that's basically what urged this prompting is that, in keeping with the wording in the contract, that I could only go back if there was, in fact, an open position.

Aplee. Supp. App. at 320. Notably, Mr. Harvey did not testify that his decision hinged on Chief Baker's intentions regarding renewal of the Agreement. As the district court concluded, the evidence showed that he made that decision in order to avoid the risk of losing his position with DPS.

The evidence, moreover, does not support Mr. Harvey's contention that his decision to invoke his right under the Agreement to seek reinstatement was an adverse employment action imposed upon him by defendants. *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135-36 (10th Cir. 2004) (rejecting plaintiff's attempt to recast his voluntary decision to resign as constructive discharge amounting to adverse employment action). Finally, the evidence also does not support his contention that he was "forced" to choose between employment with the City and continuing to work for the Task Force, because the City approved his application for secondary employment as the Task Force Coordinator.

Accordingly, Mr. Harvey has failed to demonstrate a material fact in dispute regarding whether he suffered an adverse employment action in retaliation for exercising his First Amendment rights.

**IV.**

Because no material facts are in dispute regarding the plaintiffs' claims of retaliation for exercise of their First Amendment rights, the judgment of the

-20-

district court and the district court's denial of plaintiffs' motion for

reconsideration are AFFIRMED.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge